UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

| | |
|---|---|
| GERALD SILVER, on behalf of himself and others similarly situated, | Case No. 1:22cv400_ |
| Plaintiff, | |
| v. | |
| CITY OF ALBUQUERQUE | |
| Defendant. | |

**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF PURSUANT TO THE TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. §§ 227 *et seq.* AND DEMAND FOR JURY TRIAL**

Plaintiff Gerald Silver ("Mr. Silver") brings this action against Defendant City of Albuquerque ("Defendant" or the "City") for making calls in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 et seq.  Mr. Silver advances the action by and through his attorneys, Harrison, Hart & Davis, LLC, and on behalf of all others similarly situated.  Mr. Silver complains and alleges as follows upon personal knowledge as to his own acts and experiences, and, as to all other matters, upon information and belief, including his attorneys' investigation.

**PARTIES**

1.      Plaintiff Gerald Silver is a resident of Albuquerque, New Mexico.  He has lived in Albuquerque for more than 30 years.  Mr. Silver is a U.S. Air Force veteran, retired police officer, and former court security officer for the District of New Mexico.  He received all of the calls made to him relevant in this action at cell phone number (505) 235-****.  That number was assigned to

a cellular telephone service, Verizon Wireless, which, in turn, designated it to him, at all times relevant to this action.

2.      Defendant City of Albuquerque is the largest municipality in the State of New Mexico.

3.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because the action involves the TCPA.

4.      This Court has general personal jurisdiction over Defendant because the City is located in the State of New Mexico.

5.      Venue is similarly proper in the District of New Mexico under 28 U.S.C. § 1391(b)(1), as the City resides in the State of New Mexico.

## I.      INTRODUCTION

6.      The TCPA was passed in response to voluminous complaints about telephone call abuses, in recognition that unrestricted calls can be an intrusive invasion of privacy, and in order to provide some control over calling practices.  *See* Pub. L. 102-243, § 2, at paras. 1, 5, 6, 10, 12, 13, 105 Stat. 2394 (1991); *Facebook, Inc. v. Duguid*, 141 S.Ct. 1163, 1167 (2021).

7.      Since the Act's passage, however, the number of calls made to Americans has only multiplied, and unwanted calls remain the FCC's top consumer complaint.  *See*, *e.g*., FCC, *Stop Unwanted Robocalls and Texts* (2022), https://www.fcc.gov/consumers /guides/stop-unwanted-robocalls-and-texts.

8.      Abuses have only proliferated with the development of "robocall" technology and the ubiquitousness of smart phones.  *See*, *e.g*., *Duguid*, 141 S.Ct. at 1166; Tara Siegel Bernard, *Yes, It's Bad.  Robocalls, and Their Scams, Are Surging.*, N.Y. Times, May 6, 2018.

9.      In 2021, over 50 billion robocalls were placed to recipients within the United States. *See* You Mail, *Robocall Index* (2022), https://robocallindex.com.  That is up from the roughly 30 billion that were placed nationwide in 2017.  *See id*.

10.     The TCPA places certain restrictions on prerecorded voice calls, providing:

It shall be unlawful for any person . . . to make any call (other than

a call made for emergency purposes or made with the prior express consent of the called party) using . . . [a] prerecorded voice . . . to any telephone number assigned to a    . . . cellular telephone service.

47 U.S.C. § 227(b)(1)(A)(iii).[1]

11.     To act in accordance with the law, a caller making a prerecorded voice call to a cell phone for a non-emergency purpose must have the recipient's prior express consent to receive such a call.  *See In the Matter of Rules and Regulations Implementing the TCPA of 1991* ("*Re Implementing the TCPA*"), CG Dkt. No. 02-278, 31 FCC Rcd. 9054, 9061, at para. 19 (Jul. 8, 2016).[2]  That is so whether or not the call is made for telemarketing purposes.  *See id*.

12.     Callers do not have to use any specific method to obtain recipients' prior express consent for calls that do not constitute telemarketing.  *See id*.  It can be obtained orally or in writing.  *See Re Implementing the TCPA*, CG Dkt. No. 02-278, 27 FCC Rcd. 1830, 1842, at para. 29 (Feb. 15, 2012).

13.     "[I]n limited cases, the mere giving of a cell phone number as a contact number satisfies the consent requirement as long as the call . . . is closely related to the purpose for which the consumer gave the number."  31 FCC Rcd. at 9061, para. 19.  The facts of each such situation determine the scope of the consent given, and "closely related" is to be interpreted narrowly.  *See id*.

14.     The burden is on the caller to demonstrate it obtained express consent before calling the recipient's cell phone.  *See Re Implementing the TCPA*, CG Dkt. No. 02-278, 23 FCC Rcd. 559, 564-65, at para. 10 (Jan. 4, 2008).

15.     While "local government entities, including counties, cities, and towns, . . . are . . . subject to the TCPA," the federal and state governments are not.  *Re Implementing the TCPA*, CG Dkt. No. 02-278, 35 FCC Rcd. 15052, at *1, 4, 8, paras. 3, 13, 29 (Dec. 14, 2020).

---

[1] The Supreme Court's *Duguid* decision clarified the meaning of an "automatic telephone dialing system," as that term is used in the TCPA, but did nothing to affect the Act's limitations on prerecorded voice calls.  *See Facebook, Inc. v. Duguid*, 141 S.Ct. 1163, 1173 (2021).

[2] "Congress authorized the FCC to implement rules and regulations enforcing the TCPA." *Mohon v. Agentra LLC*, 400 F. Supp. 3d 1189, 1224 (D.N.M. 2019) (internal quotation marks and modifications omitted) (citing 47 U.S.C. § 227(b)(2)).

16.     Local, state, and federal government contractors are also subject to the TCPA.  *See id.* at *4, para. 13.

17.     "A caller may be found to have made or initiated a call . . . by taking the steps necessary to physically place a . . . call[, or] by being so involved in the placing of a specific . . . call as to be directly liable for making it." *Id.* at *6, para. 19 (internal quotation marks omitted).

18.     In determining the maker of the call, the totality of the facts and circumstances surrounding the placing of a particular call are to be assessed, including "who determine[d] the content of the message, who determine[d] the recipients of the message, [and] who determine[d] the timing of when the message [was] sent." *Id.*

19.     The TCPA does incorporate the federal common law principles of vicarious liability. *In the Matter of the Joint Petition Filed by Dish Network, LLC, et al.*, CG Dkt. No. 11-50, 28 FCC Rcd. 6574, 6586-88, at paras. 33-38 (May 9, 2013).

20.     The TCPA excepts from its prohibitions calls made for "emergency purposes." § 227(b)(1)(A)(iii).  "Emergency purposes" are defined as "calls made necessary in any situation affecting the health and safety of consumers." 47 C.F.R. § 64.1200(f)(4)

21.     "The emergency purposes exception is intended for instances that pose significant risks to public health and safety, and where the use of prerecorded message calls could speed the dissemination of information regarding potentially hazardous conditions to the public." *Re Implementing the TCPA*, CG Dkt. No. 02-278, 35 FCC Rcd. 2840, 2841, at para. 4 (Mar. 20, 2020) (internal quotation marks and modifications omitted).

22.     In determining whether a call relating to the COVID-19 pandemic qualifies for the emergency purposes exception, the identity of the caller and the content of the call must be assessed.  *See id.* at 2841, para. 7.

> [T]he caller must be from a hospital, or be a health care provider, state or local health official, [] other government official[, or] a person under the express direction of such an organization and acting on its behalf.  [T]he content of the call must be solely informational, made necessary because of the COVID-19 outbreak, and directly related to the imminent health or safety risk arising out of the COVID-19 outbreak.

*Id.*

23.     Thus, for example, calls originating from hospitals providing vital and time-sensitive COVID-19 related health information, municipal officials presenting requirements on COVID-19 quarantining and testing, and pharmacies offering information on plasma donation to individuals testing positive for COVID-19 can be made lawfully without the caller obtaining prior express consent from the recipient.  *See id.* at 2842, para. 8; *Consumer and Governmental Affairs Bureau Clarification on Emergency COVID-19 Related Calls*, CG Dkt. No. 02-278, 35 FCC Rcd. 7924 (July 28, 2020).

## II.     FACTUAL BACKGROUND

24.     The City has put on a series of virtual town halls.  Certain actions it has taken in relation to them have violated the TCPA, harming Mr. Silver and other Albuquerque residents.

### A.     The City's Virtual Town Hall Campaign

25.     In early 2020, the City contracted with Broadnet Teleservices LLC ("Broadnet") to use the latter's platforms to promote and hold virtual town halls.[3]

26.     Broadnet provided "a virtual town hall [product] that allowed [the City] to host professional and moderated conversations with [its] audience members," Broadnet, *Access Live* (2022), https://www.broadnet.com/products/accesslive/, via "landline phone, mobile device, and online video or audio streaming," Broadnet, *Expanding State Government Virtual Engagement* (2022), https://www.broadnet.com/state-government-use-cases/.

27.     Broadnet also supplied an "[a]uto-calls," "notifications" product that permitted the City "to send many thousands of . . . pre-recorded voice messages in a[n] . . .

---

[3] Interestingly, a letter sent to the FCC by a law firm representing Broadnet Teleservices LLC, in support of exempting local government entities from the TCPA, specifically references virtual town halls held by the City of Albuquerque ("Defendant" or the "City").  *See* Written Ex Parte Presentation from Wilkinson, Barker, Knauer LLP to FCC, CG Dkt. Nos. 18-152, 02-278, at 2 (July 20, 2020).

automated way," delivering them "to phone numbers [where they would] be heard when [the] recipient[s] pick[ed] up the phone or listen[ed] to their voicemail."  Broadnet, *Notifications* (2022), https://www.broadnet.com/products/notifications/.

28.     According to Broadnet, with regard to such prerecorded voice calls, its government customers', like the City, "make all decisions regarding whether to make a call, the timing of the call, the call recipients, and the content of the call."  *Re Implementing the TCPA*, CG Dkt. No. 02-278, 30 FCC Rcd. 7961, 7980, 7982, at paras. 30, 33 (June 18, 2015).

29.     To the extent this recounting is accurate, the FCC has held that Broadnet's government clients are the makers of those calls, not Broadnet, because they are so involved in placing the calls as to be deemed to have initiated them.  *See* 35 FCC Rcd. 15052, at *6, para. 21.

30.     The City has put on at least 16 virtual town halls.  The first was held on March 23, 2020 and the most recent on May 19, 2022.

31.     Putting on these virtual town halls was not the only way the City could communicate information to Albuquerque's residents between those dates.

32.     During that period, the City continuously availed itself of other, more direct, means of and formats for communicating information to the public, including by holding press conferences and speaking events featuring leaders from the City, issuing press releases to and purchasing messaging time or space from local television news, radio, and newspapers outlets, and posting to its website and social media channels.

33.     Throughout that time, the City also could have made use of  its emergency broadcasting capabilities.

34.     On the days immediately preceding each of the virtual town halls, the City

6

publicized the events by using Broadnet's "auto-calls," "notifications" product to make prerecorded voice calls to thousands of Albuquerque residents, inviting them to attend.

35.     On the days the virtual town halls were actually held, the City would use the same Broadnet product to make similar prerecorded voice calls publicizing the events. These calls were made close in time to when the virtual town halls began. If a recipient answered a call, rather than let it go to voicemail, and wished to attend the virtual town hall, he or she could choose to remain on the line to be patched through to the event.

36.     The robocalling system the City used to make the prerecorded calls tracked how many recipients answered the calls, let them go to voicemail, were transferred through to the virtual town halls, and took part in the events. The City has access to this information.

37.     There were many less intrusive means than prerecorded voice calls available to the City to promote the virtual town halls, including publicizing them through local television news and radio broadcasts, in the local newspapers, on the City's website, by email, and via its various social media channels.

38.     Indeed, the City utilized some of those less intrusive alternative communication methods to notify the public about the virtual town halls it was holding.

39.     The calls publicizing the virtual town halls would appear on recipients' phones, and later their phone billing statements, as having been made from numbers associated with the City.

40.     Recipients who attempted to call the various numbers affiliated with the City from which it appeared the prerecorded voice calls promoting the virtual town halls were made— to, for example, request they not receive such calls in the future—were met with a recording

stating, "Thank you for calling Mayor Tim Keller's office in regards to our upcoming telephone town halls.  This voicemail will not be checked.  To register for upcoming town halls please visit www.cabq.gov/townhall or call 311.  All current information on coronavirus can be found at www.cabq.gov."

41.     Like that recording, neither the prerecorded voice calls the City made publicizing its virtual town halls or its website provided information on how recipients could opt out of receiving such calls.

42.     311 is the City's Community Contact Center ("311"), a centralized call center for the City.  It is the "one stop for all non-emergency City of Albuquerque questions and services."  The City, *311 Community Contact Center* (2022), https://www.cabq.gov/311.

43.     The City utilized information 311 collected to compile the lists of phone numbers it made calls to in order to publicize the virtual town halls.

44.     The City has maintained these lists of phone numbers.

45.     Making a call to 311 is often a resident's first outreach to the City about any one of the innumerable issues falling within the municipality's vast remit.

46.     Many callers make calls to 311 using their cell phones.

47.     Persons frequently make calls to 311 to report issues like graffiti, overgrown weeds, and missed trash pickup, request street repairs, and file complaints about animal noise.

48.     When calls are made to 311, the callers' numbers generally appear on the caller identification system it uses.  Callers to 311 also regularly give their numbers to 311, including their cell phone numbers, for the express purpose of the appropriate arm of the City being able to follow up with them, if necessary, about their particular issues.

8

49.     311 makes a record of each call made to it, documenting information garnered from the call and caller, including, whenever possible, the subject category of the call, the caller's specific issue or request, the caller's phone number, and the caller's name.

50.     The City harvested the numbers it made calls to publicizing the virtual town halls from those 311 gathered in these ways.  The City did so without regard to why the holders of the numbers made calls to 311.

51.     311 did not ask the callers whose numbers the City ultimately compiled and made prerecorded voice calls to promoting the virtual town halls whether they consented to receive such calls or prerecorded voice calls about informational events or events featuring the City's leaders the City would be holding more generally.

52.     Nor did the City attempt to obtain prior express consent from those it eventually made calls to publicizing the virtual town halls using Broadnet's "auto-calls," "notifications" product, even if the calls were to be made to recipients' cell phones.

53.      Instead, the prerecorded voice calls the City made promoting the virtual town halls themselves contained language inviting recipients to "sign up" or "register" for the virtual town halls by visiting www.cabq.gov/townhall or calling 311.

54.      The City thus made numerous—likely many thousands of—prerecorded voice calls to recipients' cell phones publicizing the virtual town halls without first obtaining their express consent for these calls to be made.

55.      The City has maintained records of those who registered for the virtual town halls.  Because of that, the lists of numbers it made calls to it has kept, and the records of calls 311 holds, it will be possible to ascertain whether the numbers the City made calls to publicizing the

virtual town halls were assigned to cell phones and whether those persons who received such calls on their cell phones provided prior express consent by signing up for the virtual town halls or giving their cell phone numbers to 311 for the purpose of receiving information on upcoming informational events or events featuring the City's leaders.

56.     None of the prerecorded voice calls the City made promoting the virtual town halls regarded situations affecting the health and safety of consumers other than the COVID-19 pandemic.  And, while certain of the prerecorded voice calls referred to the COVID-19 pandemic, many did not.

57.     At a minimum, in eight instances, including on May 13, 2020, June 8, 2020, July 15, 2020, October 20, 2020, October 21, 2020, December 1, 2020, and December 2, 2020, the City made prerecorded voice calls to recipients publicizing the virtual town halls that did not regard situations affecting health and safety, whether the COVID-19 pandemic or otherwise.

58.     The instances of the City making prerecorded voice calls on June 8, July 15, October 20 and 21, and December 1 and 2, 2020 are discussed below in relation to Mr. Silver.

59.     The prerecorded voice call the City made to recipients on May 13, 2020 stated:

> Hi.  This is Mayor Tim Keller, inviting you to join a live town hall tomorrow, Thursday, at 7:30 pm.  I'll be providing an update on the next phase of recovery for the City of Albuquerque and take questions live.  It's at 7:30 tomorrow and you'll receive a call just like this one, and, to participate in the town hall, just stay on the line.  There's no cost to join the call.  And you can also sign up for the telephone town hall and other events by visiting cabq.gov/townhall.  For immediate questions or assistance, please check out that same website or call 311.  Hope to see you tomorrow.

60.     This call appeared to recipients as if it was made from the number (505) 208-0264, a number associated with the City.

61.     The City determined the number the prerecorded voice call would appear as having been made from, despite its use of Broadnet's "auto-call," "notifications" product, to prevent the call from being filtered, rejected, or screened, and to mask its use of a robocalling platform.  This is known as "spoofing."

62.     The content of the prerecorded voice calls enumerated above does not support them having been made for emergency purposes.

63.     The City has access to recordings of the other prerecorded voice calls it made promoting its virtual town hall campaign.  These recordings will allow it to be determined whether those calls referenced the COVID-19 pandemic or any other imminent public health and safety issue.

64.     Serving also to demonstrate the non-emergency nature of the prerecorded voice calls made on the instances set forth above, the City chose not to make calls to numbers it had access to via 311 that contained area codes other than 505, which is the area code for Albuquerque, even though many Albuquerque residents use cell phones with numbers containing different area codes; not to utilize the option of communicating with all of the cell phones located within its boundaries; and not to make prerecorded voice calls publicizing the virtual town halls to recipients consistently, despite recipients of them not opting out of receiving those calls[4]—i.e., a recipient of one of the aforementioned calls would not necessarily receive another, let alone all of them.[5]

---

[4] As noted above, neither the City's prerecorded voice calls, the message callers to the City numbers those prerecorded voice calls appeared to be from, nor the City's website explained how recipients could request not to receive such calls in the future.

[5] The content of the virtual town halls, while not bearing on whether the prerecorded voice calls made to promote them complied with the TPCA, also suggest they were not held for strictly, or even primarily, emergency purposes.  For example, the City's online postings for its first two virtual town halls, those held on March 23 and April 14, 2020, indicated the "town hall[s would] not contain announcements of new information."  Further, the virtual town halls, which afforded the City the ability to determine the topics addressed by setting the agenda and prescreening and selecting participant questions, frequently, if not mostly, focused on subjects having nothing to

**B.      The City's Violative Activities Harm Mr. Silver**

65.      Mr. Silver has received at least seven prerecorded voice calls from the City on his cell phone promoting the virtual town halls.  He has never given the City prior express consent to make such calls to him.

1.      The City's June 2020 Call

66.      On June 8, 2020 at 7:22 PM, Mr. Silver received on his cell phone a prerecorded voice call from the City publicizing a virtual town hall it was putting on the next day.

67.      The call from the City appeared on Mr. Silver's cell phone as if made from the number (505) 208-0264.  This is the same number associated with the City that the May 13, 2020 prerecorded voice call it made appeared to be from.

68.      The City determined the number the prerecorded voice call would appear as having been made from to prevent the call from being filtered, rejected, or screened, and to mask its use of Broadnet's "auto-call," "notifications" product.

69.      The prerecorded voice call stated:

> Hi.  This is Mayor Tim Keller's office, calling to invite you to a live telephone town hall, tomorrow, Tuesday, at 9:30 am.  Mayor Keller will provide an update on recent City events and take questions live.  At 9:30 am tomorrow, you will receive a call like this one, and, to participate in the town hall, just stay on the line. There is no cost to you to join the call.  You can also sign up for all telephone town hall events by visiting www.cabq.gov/townhall.  For any immediate questions or assistance, please visit cabq.gov or call 311.

70.      Mr. Silver received this call while he was located in the District of New Mexico.

2.      The City's July 202o Calls

71.      Mr. Silver received on his cell phone two prerecorded voice calls from the City on July 15, 2020, one at 6:31 PM and the other at 7:58 PM.  Both of the calls promoted a virtual town hall the City was holding the next day.

---

do with the public's immediate health and safety.

72.     The calls from the City appeared on Mr. Silver's cell phone as if made from the

number (505) 208-0264, the same City affiliated number from which it appeared he received the

June 8 prerecorded voice call from the City, and the same number it appeared the City's May 13

call was made from.

73.     The City spoofed the number the prerecorded voice calls would appear as having

been made from to evade filtering, rejection, or screening, and to conceal its use of a mass

robocalling platform.

74.     The July 15 prerecorded voice calls stated:

> Hello.  Mayor Keller's telephone town hall has an updated time of
> 1:30 pm tomorrow, Thursday, July the 16th.  Again, that's 1:30
> pm tomorrow for Mayor Keller's telephone town hall.  Hi.  I'm
> calling from Mayor Tim Keller's office, inviting you to join a live
> telephone town hall tomorrow, Thursday, at 1:30 pm.  Mayor
> Keller and City officials will provide updates and take questions
> live.  At 1:30 pm tomorrow, you will receive a call like this one,
> and, to participate in the town hall, just stay on the line.  There's
> no cost to you to join the call.  You can also sign up for all the
> telephone town hall events by visiting www.cabq.gov/townhall.
> For any immediate questions or assistance, please visit
> www.cabq.gov or call 311.

75.     Mr. Silver was located in the District of New Mexico when he received these

calls.

        3.     The City's October 2020 Calls

76.     At 6:03 PM on October 20, 2020 and 11:07 AM on October 21, 2020, Mr.

Silver received on his cell phone prerecorded voice calls from the City publicizing a virtual

town hall it was putting on.

77.     The two prerecorded voice calls appeared on Mr. Silver's cell phone as if they

were made from (505) 226-8705, which is a number associated with the City.

78.     The City chose that number for the calls to appear to have been made from

to avoid call filters, rejection, and screening, and to obscure its use of a mass dialing system.

79.     The October 20 call stated:

> Hi.  I'm calling from Mayor Tim Keller's office to invite you to a
> live telephone town hall tomorrow at 11:00 am.  At that time, you

will receive a call like this one, inviting you to participate.  There
is no cost to join.  Simply stay on the line at that time.  This is
your chance to hear directly from Mayor Keller and City leaders,
and ask questions.  To register, visit www.cabq.gov/ townhall or
call 311.

80.     The October 21 call stated, "Hi.  I'm calling from Mayor Tim Keller's office

to invite you to join me for a telephone town hall meeting that is happening right now.  We're

sorry we missed you.  To register for future events, please visit www.cabq.gov/townhall or call

311."

81.     Mr. Silver was located in the District of New Mexico when he received those

calls.

4.     The City's December 2020 Calls

82.     On December 1 and 2, 2020 Mr. Silver received on his cell phone

prerecorded voice calls from the City promoting a virtual town hall it was holding.  He received

the December 1 call in the afternoon; the precise time at which he received it is unknown at

present.  Mr. Silver received the December 2 call at 12:01 PM.

83.      The calls appeared on Mr. Silver's cell phone as if they were made from the
same number the October calls were made from, (505) 226-8705.  The City spoofed that number
to prevent the calls from being filtered, rejected, or screened, and to hide its use of Broadnet's
robocalling product.

84.     The prerecorded voice call the City made on December 1 stated:

Hi, there.  I'm calling from Mayor Tim Keller's office to invite
you to our live telephone town hall tomorrow at 12:00 pm.  At that
time, you will receive a call like this one, inviting you to
participate.  There is no cost to join.  Simply stay on the line at
that time.  This is your chance to hear directly from Mayor Keller
and City leaders—to ask your questions.  To register, visit
cabq.gov/townhall or call 311.

85.     The December 2 call stated, "Hi.  I'm calling from Mayor Tim Keller's office

to invite you to join me for a telephone town hall meeting that is happening right now.  We're

sorry we missed you.  To register for future events, please visit cabq.gov/townhall or call 311."

86.      Mr. Silver was located in the District of New Mexico when he received the

two calls.

87.     Despite the language contained in the October and December 2020 calls, as well as the recorded message persons calling the numbers from which the City's prerecorded voice calls were apparently made would receive,[6] regarding registering for future virtual town halls by visiting www.cabq.gov/townhall or calling 311, persons calling 311 to express interest in attending the virtual town halls or wishing to sign up for them were directed to www.cabq.gov/townhall by 311.  That is, 311 did not have the ability to register persons for the virtual town halls, it could only direct callers with interest in taking part in them or desiring to sign up for them to the City's webpage concerning the virtual town halls.

88.     Once on the www.cabq.gov/townhall page, a person could click a link that would take them to a page identifying the City and "One Albuquerque" at its top, stating "Thank you for your interest in Mayor Keller's Telephone Town Hall Events. . . .  Simply register below to participate.  After you register, you will receive a phone call to join the Telephone Town Hall," including text-entry boxes for "First Name," "Last Name," "Phone Number," and "Email Address," and providing a "Submit" button at its bottom.  This registration page has been hosted by Mailchimp, a small business marketing platform.

5.      Mr. Silver's Contacts with 311 and the City

89.     Over the years, Mr. Silver has occasionally called 311 using his cell phone.  He has done so to report things such as a damaged garbage bin, a downed tree blocking the sidewalk, and a sidewalk in need of repair.

90.     He does not recall ever giving 311 his cell phone number in relation to those calls but acknowledges that he may have.

91.     Mr. Silver did not register to attend any of the City's virtual town halls.  Nor did he ever interface with the City or 311 regarding them.

92.     He also never interfaced with the City or 311 regarding any other kind of informational events being held by the City or events featuring leaders from the City.

---

[6] *See supra* at para. 35.

93.     Mr. Silver did not give the City prior express consent to make the prerecorded voice calls publicizing its virtual town halls he received to his cell phone.

94.     Mr. Silver is aware of other persons who, like him, received on their cell phones unconsented to, non-emergency calls from the City promoting its virtual town halls.

### III.     CLASS ACTION ALLEGATIONS

95.     Mr. Silver realleges and incorporates by reference herein all allegations previously made in paragraphs 1-94 above.

96.     This class action is brought and may be maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure.

97.     The proposed Class is defined as follows:

> All persons in the United States and its Territories whose cell phones the City made a prerecorded voice call to regarding a virtual town hall it was holding before such persons registered to attend any virtual town halls by visiting www.cabq.gov/townhall, where the calls did not refer to the COVID-19 pandemic or other situations potentially affecting the public's health and safety imminently, at any time in the period that begins four year from before the date of this complaint's filing to trial.

98.     Specifically excluded from the proposed Class is the City, its elected officials, officers, employees, agents, representatives, and their parents and children, the City's partners and joint venturers, or entities controlled by the City, and their heirs, successors, assigns, or other persons or entities related to or affiliated with the City and/or its elected officials, officers, employees, agents, representatives, or any of them.

99.     The Judge assigned to this action as well as the Judge's immediate family members, parents, and siblings are also specifically excluded from the proposed Class.

100.     Additionally, specifically excluded from the proposed Class are Mr. Silver's counsel and their immediate family members, parents, and siblings.

101.     The Class definitions may be expanded or narrowed by amendment or amended complaint as additional information is obtained through further investigation and discovery.

102.     The Class is so numerous that joinder of all the members is impracticable.  Mr. Silver does not know the exact number of members in the Class but he reasonably believes the group to be in the tens of thousands.  Class members should be readily identifiable through records the City maintains or has access to.

103.     The disposition of the Class's claim in a single action will provide substantial benefits to all parties and the Court.

104.     There are several well-defined questions of law and fact common to Mr. Silver and the Class members.  Some of these common questions are:

    a.   Whether the City violated the TCPA by making non-emergency, unconsented to prerecorded voice calls to any numbers assigned to a cell phone service?

    b.   Whether callers who provided their cell phone numbers to 311 for purposes wholly unrelated to receiving information about upcoming forums, town halls, press conferences, or other such informational events, or events featuring the City's leaders, necessarily consented, in accordance with the TCPA, to receiving on their cell phones prerecorded voice calls from the City relating to such?

    c.   Whether the City took the steps necessary to physically place the prerecorded voice calls or was so involved in their placement as to be liable under the TCPA for making them—i.e., who determined the content, recipients, and timing of the calls?

    d.   How many instances of the City making non-emergency prerecorded voice calls—i.e., calls not referencing the COVID-19 pandemic or other situations potentially affecting the public's health and safety imminently—have there been?

    e.   Whether the Class members are entitled to statutory damages?

f.   Whether the members of the Class are entitled to treble damages because the City acted knowingly and/or willfully?

g.   Whether the Class members are entitled to injunctive relief?

105.   As a person who received at least seven unconsented to, non-emergency prerecorded voice calls from the City, Mr. Silver's claims are typical of those of the members of the Class in that they arise from the City's common course of conduct and are based on the same legal and equitable theories.

106.   Mr. Silver will fairly and adequately represent and protect the interests of the Class.

107.   Moreover, Mr. Silver anticipates that additional persons also capable of fairly and adequately representing and protecting the interests of the Class will be added to the action as named plaintiffs by amended complaint as more information is obtained through further investigation and discovery.

108.   Mr. Silver has retained competent and experienced counsel who have significant experience in complex, mass, and class action litigation, including consumer actions.

109.   Mr. Silver and his counsel are committed to prosecuting this action vigorously on behalf of the Class members.

110.   Neither Mr. Silver nor his counsel have interests that are contrary to or are antagonistic to those of the members of the Class.

111.   The City has engaged in a common course of conduct towards Mr. Silver and the Class members.  The common issues arising from this conduct that have impacted Mr. Silver and the members of the Class predominate over any individual issues.

112.   A class action is the superior method for the fair and efficient adjudication of this controversy.

113.   The interest of individual members of the Class in independently controlling the prosecution of separate claims against the City is small because the statutory damage figures available in an individual action for violation of the TCPA here are small.

114.    In this instance, class treatment is superior to multiple individual suits or piecemeal litigation because it will conserve judicial resources, promote consistency and efficiency of adjudication, provide a forum for small claimants, and deter illegal activity.

115.    No unusual difficulties relating to the management of this case as a class action present themselves.

## IV.    CAUSE OF ACTION

### Violations of the TCPA, 47 U.S.C. § 227 *et seq*.

116.    Mr. Silver realleges and incorporates by reference herein all allegations previously made in paragraphs 1-115 above.

117.    The City made prerecorded voice calls to Mr. Silver's cell phone for a non-emergency purpose without his prior express consent, violating the TCPA, and causing him cognizable harm.  *See* 47 U.S.C. § 227(b)(1)(A)(iii); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Dish Network, LLC*, 17 F.4th 22, 34 (10th Cir. 2021).

118.    The City made prerecorded voice calls to the cell phones of other members of the Class for a non-emergency purpose without their prior express consent, violating the TCPA, and causing them cognizable harm.  *See id.*

119.    The foregoing acts of the City constitute numerous and multiple negligent, and knowing and/or willful, violations of the TCPA.  *Mohon v. Agentra LLC*, 400 F. Supp. 3d 1189, 1225 (D.N.M. 2019) ("To plead a TCPA § 227(b)(1)(A)(iii) violation, a plaintiff must show that: (i) a defendant made a telephone call; (ii) to his or her [cellular] telephone; (iii) using any . . . prerecorded voice.") (internal quotations marks omitted); *see also Dendy v. Chartrand*, No. 18-CV-118, 2019 WL 719762, at *2 (D.N.M. Feb. 20, 2019).

120.    As a result of the negligent violations, Mr. Silver and the members of the Class are entitled to an award of $500.00 in statutory damages for each and every such violation.  47 U.S.C. § 227(b)(3)(B).

121.    As a result of the knowing and/or willful violations, Mr. Silver and the members of the Class are entitled to an award of $1,500 in statutory damages for each and every such violation.  47 U.S.C. § 227(b)(3)(B)-(C).

122.    Mr. Silver and the members of the Class are also entitled to and seek injunctive relief prohibiting such conduct in the future.  47 U.S.C. § 227(b)(3)(A).

## **PRAYER**

Mr. Silver, on behalf of himself and the Class members, prays for the following relief:

a.      Certification of the Class;

b.      Appointment of Plaintiff Gerald Silver as Class representative;

c.      Appointment of the law firms representing Mr. Silver as Class counsel;

d.      An award of statutory damages;

e.      Treble damages according to statute;

f.      An injunction barring Defendant from engaging in the illegal conduct described herein; and

g.      Any other relief that this Court deems just.

Respectfully submitted,

HARRISON HART & DAVIS LLC

*/s/ Carter B. Harrison, IV*
Carter B. Harrison, IV
924 Park Ave SW, Suite E
Albuquerque, NM 87102
505.295.3261
carter@harrisonhartlaw.com

-and-

Jason Fisher
Emergent, LLP
5 Third Street, Suite 1000
San Francisco, CA 94103
415.894.9284

jason@emergent.law
*Pro Hac Vice Pending*

Attorneys for Plaintiffs